## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO.  H-14-43** |
| | § | |
| **CONRAD ALVIN BARRETT** | § | |

## DEFENDANT BARRETT'S MOTION TO DISMISS INDICTMENT BASED ON THE UNCONSTITUTIONALITY OF THE FEDERAL HATE CRIME STATUTE AND MEMORANDUM OF LAW IN SUPPORT THEREOF

### I.    BACKGROUND AND NOTE REGARDING BINDING PRECEDENT

Defendant BARRETT is charged in a 1 count Indictment with causing bodily injury to another because of his actual or perceived race, color or national origin (a "hate crime") in violation of 18 U.S.C. § 249.   The essence of the case is the allegation that Defendant Barrett, while playing "The Knockout Game," assaulted an elderly African American male based on his race, color, or national origin.

In this motion, Defendant BARRETT challenges the constitutionality of 18 U.S.C. §249.  The Court should be aware that there is recent binding precedent on this issue.  On April 24, 2014, the United States Court of Appeals for the Fifth Circuit, issued its opinion in *U.S. v. Cannon.* 750 F3d. 492.  Citing *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409 (1968), as binding precedent, the court upheld 18 U.S.C. §249(a)(1) as a valid exercise of congressional judgment.  The defendants in that case subsequently petitioned the United States Supreme Court for review.

That petition was denied on December 1, 2014.  Defendant BARRETT, presents this challenge in order to preserve this issue in the record.

## II.   THE STATUTE

On October 28, 2009, President Barack Obama signed into law the Matthew Shepard and James Byrd, Jr.  Hate Crime Prevention Act. This act is codified at 18 U.S.C. §249 and broadens federal jurisdiction over what were previously State Court street crimes, if bias is a motivation for the commission of the offense. A copy of the Act and its Congressional Findings are attached as Exhibit 1.

The hate crime statute is divided into sections. One section makes it an offense to cause or attempt to cause bodily injury to another based on actual or perceived race or color. See 18 U.S.C. §249(a)(1). Another section of the statute makes it an offense to cause or attempt to cause bodily injury to another based on actual or perceived religion, national origin, gender, sexual orientation, gender identity or disability. See 18 U.S.C. §249(a)(2).  With respect to race or color, there is no requirement that the conduct involve: (a) interstate or foreign travel, (b) using a channel, facility or instrumentality of interstate or foreign commerce or (c) the special maritime or territorial jurisdiction of the United States. With respect to religion, national origin, gender, sexual orientation, gender identity or disability, there is a specific requirement that the conduct involve: (a) interstate or foreign travel, (b) using a channel, facility or instrumentality of interstate or foreign commerce or (c) the special maritime or territorial jurisdiction of the United States.

In enacting 18 U.S.C. §249, Congress set forth 10 "findings" that purport to provide a basis for Federal jurisdiction. In essence, Congress makes "findings" that violence motivated by actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity or disability of the victim poses a serious *national* problem (emphasis added). They further "find" that it "substantially affects interstate commerce in many ways" including the movement of members of the targeted groups; their obtaining goods and services and employment; perpetrators cross state lines to commit such violence; channels of interstate commerce are used to facilitate the commission of such violence; and such violence is committed using articles that have traveled in interstate commerce.

Finally, Congress made "findings" that the institutions of slavery and involuntary servitude were defined by race, color and ancestry of those held in bondage, and that eliminating racially motivated violence is an important means of eliminating the badges, incidents and relics of slavery and involuntary servitude (citing the 13th, 14th and 15th Amendments of the United States Constitution).

## III.   FEDERALISM

It is the most fundamental tenet of federalism that powers not conferred upon the federal government are reserved to the States. Furthermore, it is beyond dispute that the United States Constitution reserves general police powers to the States. Federal law does not reach ordinary murders, rapes, arson, assaults, etc.

As repugnant as "hate crimes" may be, the Constitution does not vest authority to the Federal government to prosecute such crimes without a federal nexus. In fact, at least 45 states have criminal statutes that impose harsher penalties for crimes that are motivated by bias.  The issue is not whether hate crimes are repugnant to society, or whether they are deserving of more severe punishment. Rather, the issue is whether the United States Constitution confers authority to the Federal government to prosecute State street crimes if bias is the motivation for the commission of the offense.

## IV.    PURPORTED THEORIES OF FEDERAL JURISDICTION

Congress is obviously aware that their authority to legislate Federal laws is limited by the United States Constitution. The legislative history of the Matthew Shepard and James Byrd, Jr. Hate Crime Prevention Act reveals that Congress relied upon the Commerce Clause, the 13th Amendment, the 14th Amendment and the 15th  Amendment as purported bases to confer federal authority. Each of these provisions will be examined below.

## V.    THE COMMERCE CLAUSE

The Commerce Clause states that Congress is constitutionally empowered "[t]o regulate commerce with foreign nations, and among the several states, and with Indian tribes." U.S. Constitution Article I, Section 8, Clause 3.

In order for the Commerce Clause to confer federal authority, the law must be shown to regulate activities "substantially affecting" interstate commerce. See

e.g. *United States v. Darby*, 312 U.S. 100 (1941). In subsequent cases, the Supreme Court has applied a "cumulative effects" test to determine whether an activity "substantially affects" interstate commerce.  Under the cumulative effects test, the activity can be regulated if all the regulated activities of similarly situated individuals taken cumulatively could have substantial effect on interstate commerce. For example, in *Heart of Atlanta Motel v. United States*, 379 U.S. 241, (1964), the Court upheld provisions of the 1964 Civil Rights Act that required the Heart of Atlanta Hotel to rent its rooms to persons regardless of race.

However, the reach of the Commerce Code is not limitless. See e.g. *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000). *United States v. Lopez, supra,* provides a primer on federalism and the Commerce Clause, which will be succinctly set forth herein. The United States "Constitution creates a Federal Government of enumerated powers." 514 U.S. at 552.   "As James Madison wrote: 'The powers delegated by the proposed Constitution to the Federal government are few and defined. Those which are to remain in the States governments are numerous and indefinite'." *Id.* The Commerce Clause, however, confers "three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of channels of interstate commerce (cases omitted).  Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, even though the threat may come only from intrastate activities (cases omitted).

Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." *Id.* at 558-59.

At issue in *Lopez, supra*, was whether the Gun-Free School Zone Act (18 U.S.C. § 922q) making it a federal offense for any individual to knowingly possess a firearm within a school zone, exceeded Congress' authority under the Commerce Clause. *Id.* at 552.   Turning to the three broad categories set forth above, the Supreme Court observed that the Gun Free School Zone Act, if it is to be sustained, must be under the third category as a regulation that substantially affects interstate commerce. *Id.* at 559.   The Court then observed that the Act was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly we might define those terms." *Id.* at 561.

The government argued, however, that "possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and through the mechanism of insurance, those costs are spread throughout the population (cases omitted). Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. Cf. *Heart of Atlanta Motel*, 379 U.S. at 253". *Id.* at 563-64. The Supreme Court made quick shrift of this argument by observing that "if we were to accept the government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Id.* at 564.

The Court then struck down the law as an unconstitutional expansion of power to the Federal government. *Id.* at 567-68.

The next landmark Commerce Clause case to be decided by the Supreme Court is almost exactly on point to the instant case, and compels a conclusion that the "hate crime" statute is an unconstitutional delegation of authority to the Federal government. See *United States v. Morrison, supra*. At issue in *Morrison* was whether Congress had the authority to enact the Violence Against Women Act ("VAWA") that provided a civil remedy for victims of gender-motivated violence. 529 U.S. at 601-02. This act specified that "all persons within the United States shall have the right to be free from crimes of violence motivated by gender". The Act defines a "crime of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *Id.* at 605-06.

As is *Lopez, supra*, the Supreme Court began its analysis by setting forth basic principals of Federalism. "Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution. 'The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.' *Marbury v. Madison,* 1 Cranch 137, 176, 2 L.Ed. 60 (1803) (Marshall, C. J.)." *Id.* at 607. The Supreme Court then set forth the "three broad categories of activity that Congress may regulate under its commerce power" as set forth in *Lopez. Id.* at 608. Furthermore, as in *Lopez*, only the third

category was at issue. Similarly, as in *Lopez*, the statute "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 610. The Court then stated: "[w]ith these principals underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear. Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 613. The Supreme Court then held:

We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. *Lopez,* 514 U.S., at 568, 115 S.Ct. 1624 (citing *Jones & Laughlin Steel,* 301 U.S., at 30, 57 S.Ct. 615). In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States."

*Id.* at 617-18.

Lastly, The Supreme Court observed that " [i]f the allegations here are true, no civilized system of justice could fail to provide her a remedy for the conduct of respondent Morrison. But under our federal system that remedy must be provided by the Commonwealth of Virginia, and not by the United States." *Id.* at 627.

Finally, the "findings" of Congress that the statute satisfies the Commerce Clause, and that Congress is further empowered by the 13th, 14th and 15th Amendments to the United States Constitution, cannot "save" the unconstitutionality of the statute. See *Morrison, supra,* at 615-16:

But the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in *Lopez*, "[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." 514 U.S., at 557, n. 2, 115 S.Ct. 1624 (quoting *Hodel*, 452 U.S., at 311, 101 S.Ct. 2389 (REHNQUIST, J., concurring in judgment)). Rather, "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." 514 U.S., at 557, n. 2, 115 S.Ct. 1624 (quoting *Heart of Atlanta Motel*, 379 U.S., at 273, 85 S.Ct. 348 (Black, J., concurring)).

In these cases, Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce

"by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; ... by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." H.R. Conf. Rep. No. 103-711, at 385, U.S.Code Cong. & Admin.News 1994, pp. 1803, 1853.

Accord, S.Rep. No. 103-138, at 54. Given these findings and petitioners' arguments, the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded. See *Lopez, supra*, at 564, 115 S.Ct. 1624. The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

Petitioners' reasoning, moreover, will not limit Congress to regulating violence but may, as we suggested in *Lopez*, be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce,

and childrearing on the national economy is undoubtedly significant. Congress may have recognized this specter when it expressly precluded §13981 from being used in the family law context. See 42 U.S.C. §13981(e)(4). Under our written Constitution, however, the limitation of congressional authority is not solely a matter of legislative grace. See *Lopez, supra,* at 575-579, 115 S.Ct. 1624 (KENNEDY, J., concurring); *Marbury,* 1 Cranch, at 176-178, 2 L.Ed. 60.

In conclusion, 18 U.S.C. §249 cannot be upheld as a valid grant of authority to the Federal government under the Commerce Clause.

## VI.   THE 13TH AMENDMENT

The 13th Amendment states in its entirety as follows:

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. The Congress shall have power to enforce this article by appropriate legislation.

Congress has made "findings" indicating that it relies on the 13th Amendment, at least in part, as a basis of authority to enact 18 U.S.C. §249. Therefore, the cases interpreting the 13th Amendment will be discussed herein.

A logical starting point to analyze the 13th Amendment is the Supreme Court's landmark case of *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). There the Court was called upon to determine the constitutionality of 42 U.S.C. §1982, which provided that: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real property." 392 U.S. at 412. The factual background was that a private subdivision refused to sell Jones a home for the

"sole reason" that he was a "negro". *Id.* Jones sought injunctive relief. The Respondents argued that the statute was unconstitutional since there was no requirement of State action; rather, the statute encompassed every racially motivated refusal to sell or rent property. *Id.* at 421. Justice Stewart framed the question as "whether Congress has power under the Constitution to do what §1982 purports to do: to prohibit all racial discrimination, private and public, in the sale and rental of property." *Id.* at 437. Justice Stewart stated, "Our starting point is the 13th Amendment" for it was pursuant to that constitutional provision that §1982 was enacted. *Id.* at 437-38. The Court first stated, "[a]s the text reveals, the 13th Amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Id.* at 438. "Thus, the fact that §1982 operates under the unofficial acts of private individuals, whether or not sanctioned by State law, presents no constitutional problem." *Id.* "The constitutional question in this case, therefore comes to this: Does the authority of Congress to enforce the 13th Amendment 'by appropriate legislation' include the power to eliminate all racial barriers to the acquisition of real and personal property." *Id.* The Court then stated, "[w]e think the answer to that question is plainly yes." *Id.* "At the very least the freedom that Congress is empowered to secure under the 13th Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot

say that being a free man means at least this much, then the 13th Amendment made a promise the Nation cannot keep." *Id.* at 443.

The Supreme Court relied upon *Jones v. Alfred H. Mayer Co., supra* in *Griffin v. Breckenridge*, 403 U.S. 88 (1971). *Breckenridge* involved a civil complaint filed under 42 U.S.C. §1985(3), which provided a civil cause of action against a conspiracy to deprive a person or class of persons their right to travel on public highways. 403 U.S. at 90. The complaint alleged that the defendants (members of the KKK) acting under a mistaken belief that one of the black travelers was a civil rights worker, blocked their car and beat them with clubs. *Id.* at 90-91. In upholding the constitutionality of the Act under the 13th Amendment, the Supreme Court observed:

And surely there has never been any doubt of the power of Congress to impose liability on private persons under Section 2 of that amendment, 'for the amendment is not a mere prohibition of state laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.' (cases omitted). Not only may Congress impose such liability, but the varieties of private conduct that it may make criminally punishable or civilly remediable extend far beyond the actual imposition of slavery or involuntary servitude. By the 13th Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free. To keep that promise, 'Congress has the power under the 13th Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation.' *Jones v. Alfred H. Mayer Co., supra*, at 440, 88 S.Ct., at 2203. We can only conclude that Congress was wholly within its powers under Section 2 of the 13th Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men.

*Id.* at 105.

Several cases have addressed the constitutionality of 18 U.S.C. §245(b) which makes it an offense to use force because of race, etc., because the person was using a public facility. In *United States v. Bledsoe*, 728 F.2d 1094 (8th Cir. 1984), the defendant and his companions went to a park to "harass homosexuals". 728 F.2d at 1095. They went into a park restroom where a black man was in the restroom sitting on a stool with his pants down to his knees. The defendant struck him with a baseball bat. The victim ran out of the restroom, but fell down because his pants were still to his knees. The defendant continually beat him with a baseball bat as he lay on the ground, crushing his skull and killing him. *Id.* at 1095-96. The defendant was indicted under 18 U.S.C. §245(b) which makes it an offense to injure another because of his race, color, religion or national origin "because he is or has been participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or jurisdiction thereof." *Id.* at 1096. The defendant was convicted and sentenced to life in prison. *Id.* at 1095.   On appeal, the defendant argued that the statute was unconstitutional because it applied to purely private action. *Id.* at 1096.   In upholding the constitutionality of the statute, the Eighth Circuit stated that the 13th Amendment can reach purely private action, citing *Jones v. Alfred H. Mayer Co., supra.* "Negroes have been forced to use segregated facilities in going about their daily lives, having been excluded from public parks (cases omitted). We therefore reject the appellant's argument and hold that 18 U.S.C. §245(b) does not exceed the

scope of power granted to Congress by the Constitution. *Id.* at 1097.

The Second Circuit also had an opportunity to address the constitutionality of 18 U.S.C. §245(b) in *United States v. Nelson*, 277 F.3d 164 (2nd Cir. 2002). As in *Bledsoe*, the facts were reprehensible. A station wagon struck two children in Brooklyn, New York. The driver of the station wagon was Jewish, and both children were African American. A large crowd gathered and perceived that the Jewish driver of the car received more favorable treatment from the emergency medical technicians than the African American children, even though his injuries were not as severe. 277 F.3d at 169.  An African American man, co-defendant Price, began inciting the crowd, stating, among other things, "If it was a black man that did this they would have gone to jail instead of being placed inside an ambulance for safekeeping...The Jews get everything they want...Let's get the Jews, an eye for an eye". *Id.* at 170. The crowd then proceeded to Kingston Avenue, a predominantly Jewish commercial street. Once there, Defendant Nelson located Yankel Rosenbaum, a bearded man in orthodox Jewish dress. Nelson stabbed Rosenbaum, who later died of the stab wounds. *Id.* at 170-71. Nelson was convicted and received a prison sentence of 235 months.  *Id.* at 173. On appeal, Nelson argued the statute was unconstitutional. The Second Circuit analyzed the constitutionality of the statute under the 13th Amendment. The Court determined that "race" as used in the Amendment is a term of art, and although Jews are not technically a "race", they are a race as that term is used in the 13th Amendment. *Id.*

at 177-78. The Court then cited *Jones v. Alfred H. Mayer Co., supra*, for the proposition that Section 2 of the 13th Amendment "clothed Congress with the power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery in the United States*." (emphasis in original)  *Id*. at 183. The Court also cited *Griffin v. Breckenridge* for the proposition that Section 2 of the 13th Amendment "extended far beyond the actual imposition of slavery or involuntary servitude." *Id*. at 184. However, *Griffin* placed limitations in ensuring that Federal statutes did not create a "general Federal tort law." *Nelson* at 185, citing *Griffin*. The *Bledsoe* Court held that §245(b)(2)(B) stops well short of creating a general Federal law of criminal assault, and instead restricts its attention to acts of force that involve two distinct kinds of discriminatory relationships: (1) an animus against the victim on account of race, religion, etc. *and* (2) an intent to act against the victim on account of her using public facilities, etc., that is, because she was engaging is an *activity* the statute protects (emphasis in original).  *Id*. at 189.  In this regard, the Court observed that "[i]t is important to understand that acts of violence or force committed against members of a hated class of people with the intent to exact retribution for and create dissuasion against their use of *public facilities* have a long and intimate historical association with slavery." (emphasis added). *Id*. at 190.

The Second Circuit concluded:

Section 245(b)(2)(B)'s prohibition against private violence motivated by the victim's race, religion, etc., *and* because of the victim's use of a public facility, etc.,

falls comfortably within Congress's "power under the 13th Amendment rationally to determine what are the badges and the incidents of slavery, and [its] authority to translate that determination into effective legislation." *Jones,* 392 U.S. at 440, 88 S.Ct. 2186. Accordingly, we find that § 245(b)(2)(B), as applied in the case at bar, is a constitutional exercise of Congress's power under the 13th Amendment.

> *Id.* at 190-91.

Importantly, the Second Circuit observed that they were not deciding, and it was an open question, whether the constitutionality of the statute would have been upheld if the force was not as a result of the victim's use of a public facility.

Specifically, the Court stated:

The presence of these two (narrowing) requirements[5] in § 245(b)(2)(B) makes easier our upholding of the statute's constitutionality. But we did not so read the statute *in order* to avoid constitutional difficulties. Accordingly, we emphasize that we are not holding that both (and in particular the second) of the conditions are necessary to the statute's constitutionality. Thus a statute, for example, that federally criminalized private racially motivated violence quite generally might or might not be constitutional under the 13th Amendment. *Cf. Griffin,* 403 U.S. at 105, 91 S.Ct. 1790 ("We can only conclude that Congress was wholly within its powers under Section 2 of the 13th Amendment in creating a statutory cause of action for Negro citizens who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men.").

*Id.* at fn 25.

The Ninth Circuit has also upheld the constitutionality of 18 U.S.C. § 245(b)(2)(B). See *United States v. Allen*, 341 870 (9th Cir. 2003). In *Allen*, members of a Montana "skinhead" group were "patrolling" a public park in Billings, Montana for racial minorities and Jews. 341 F.3d at 873. They came upon two Hispanics and a Black. They "surrounded them wielding weapons, berated them with racial epithets and forced them out of the park for no reason other than

Case 4:14-cr-00043   Document 44   Filed in TXSD on 01/30/15   Page 17 of 21

their race." *Id*. They were convicted of violating 18 U.S.C. §245(b)(2)(B).   On appeal, they argued that Congress' enacting 18 U.S.C. §245(b)(2)(B) was not pursuant to its authority under the 13th Amendment.  *Id*. at 883.  The Ninth Circuit observed that both the Second and Eighth Circuits had already addressed this issue, and concluded that 18 U.S.C. §245(b)(2)(B) was a constitutional exercise of Congress' authority under the 13[th] Amendment. See *United States v. Nelson* and *United States v. Bledsoe. Id.* at 883.  In upholding the statute, the Ninth Circuit observed that the statute "by no means attempts to create a general, undifferentiated Federal law of criminal assault." Rather, "the statute requires that victims be harmed *because of* their race or religion and *because of* their use of a public facility." (emphasis in original)    *Id*. In light of these two specific prohibitions, the statute "falls comfortably within Congress' power under the 13th Amendment rationally to determine what are the badges and incidents of slavery, and its authority to translate that determination into effective legislation."  *Id*. at 884.  There "can be no doubt that interfering with a person's use of a public park because he is black is a badge of slavery." *Id*.

## VII.   THE   HATE   CRIME   STATUTE   ANALYZED   UNDER   THE FOREGOING PRECEDENTS

There is not a single appellate decision that addresses the constitutionality of the recently enacted Federal Hate Crime Statute. There are, of course, numerous decisions as previously set forth that analyze the 13th Amendment. The 13th Amendment has provided a basis for Federal jurisdiction for a civil statute that

provided injunctive relief where there was racial discrimination in purchasing real estate (see *Jones v. Alfred H. Mayer Co.*), for a civil statute prohibiting conspiracies to deprive one of the right to travel public highways (see *Griffin v. Breckenridge*), and a criminal statute prohibiting the use of force based upon race, etc., where there is a state park or public facility (see e.g. *United States v. Nelson, United States v. Bledsoe* and *United States v. Allen*). No appellate decision has ever validated the creation of a Federal criminal assault statute based purely on race.

Nevertheless, there are two District Court decisions upholding the Federal Hate Crime Statute. See *United States v. Beebe*, 807 F.Supp 2d 1045 (D.NM 2011)and *United States v. Maybee*, 2011 WL 2784446 (W.D. Ark.). *Beebe* cites *Jones v. Alfred H. Mayer Co.*, *United States v. Allen* and *United States v. Nelson* as "precedent" that "confirms that it was rational for Congress to conclude that racially motivated violence is a badge or incident of slavery." 807 F.Supp at 1053.

*Maybee* cites the same line of cases as support that such conduct is a "badge of slavery."  Then *Maybee* adds: "This Court has found no precedential authority to support the proposition that, in order to be constitutional under the 13th Amendment, a statute must include not only a requirement that the conduct sought to be prohibited be such as to constitute a 'badge of incident of slavery', but also a requirement that the conduct must involve the use of a public facility, etc." *Id.* at 6.

It is respectfully submitted that *Beebe* and *Maybee* are incorrectly decided. If their reasoning is applied, the Federal government has usurped the traditional

authority of the States to prosecute simple assaults, provided race, color or national

origin is a motivating factor. In every other case, there has been a requirement that

interstate commerce, public highways, or public parks and facilities be involved, or

that it relates to true incidents of slavery, such as blacks being prohibited from

owning or renting property.

In conclusion, the 13th Amendment should not be stretched to limits never

seen before, to create a Federal street crime, simply because race may have been a

motivating factor.

## VIII. THE 14TH AMENDMENT

The 14th Amendment states in its entirety as follows:

> All persons born or naturalized in the United States and subject to the
> jurisdiction thereof are citizens of the United States and the State wherein
> they reside. No State shall make or enforce any law which shall abridge the
> privileges or immunities of citizens of the United States; nor shall any State
> deprive any person of life, liberty, or property, without due process of law;
> nor deny to any person within its jurisdiction the equal protection of the
> laws.

The 14th Amendment as a basis to confer federal authority can be disposed

of very quickly:

The 14th amendment prohibits a state from depriving any person of life, liberty, or
property, without due process of law; but this adds nothing to the rights of one
citizen as against another. It simply furnishes an additional guaranty against any
encroachment by the States upon the fundamental rights which belong to every
citizen as a member of society.

> *Morrison, supra* at 622.

Since there is no "state action" in the instant case, the 14th Amendment is

simply inapplicable.

## IX.   THE 15TH AMENDMENT

The 15th Amendment states in its entirety as follows:

Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

Section 2. The Congress shall have power to enforce this article by appropriate legislation.

This is not a voting case and the 15th Amendment is simply inapplicable.

## X.   CONCLUSION

In conclusion, 18 U.S.C. §249 is unconstitutional and the indictment should

be dismissed.

## XI.   CERTIFICATE OF CONFERENCE

On January 30, 2015, undersigned counsel conferred with Assistant United

States Attorney Ruben Perez requesting his position with respect to this motion.

Mr. Perez is opposed to the granting of this motion.

**WHEREFORE, PREMISES CONSIDERED**, Defendant BARRETT

prays that this Honorable Court enter an order dismissing the indictment.

Respectfully submitted,

___/s/ George J. Parnham_____
GEORGE J. PARNHAM
State Bar No.  15532000
440 Louisiana, Ste. 200
Houston, Texas 77002
Tele:  (713) 224-3967
Fax:   (713) 224-2815

ATTORNEY FOR DEFENDANT
CONRAD A. BARRETT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Motion to Dismiss the Indictment** was electronically filed and delivered to the Assistant United States Attorney in this cause, Mr. Ruben Perez, on this the 30th day of January, 2015.

___/s/ George J. Parnham_____
GEORGE J. PARNHAM